Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3067 | **DATE** | 10/21/2004 |
| **CASE TITLE** | Vicki Hossack vs. Floor Covering Associates of Joliet, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motions for remittitur (60-1), to enter judgment on the verdict (61-1), and for back pay (67-1) are denied as moot. Defendant's motion for sanctions (22-1) is denied. Defendant's motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) (54-1), to apply statutory damages limitations (62-1), and for remittitur (63-1) are denied as moot. Defendant's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) (68-1) is granted. The jury verdict in favor of plaintiff is vacated. Court enters judgment in favor of defendant Floor Covering Associates of Joliet, Inc. and against plaintiff Vicki Hossack. This is a final and appealable order. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | OCT 22 2004 | |
| | Notified counsel by telephone. | | date docketed | 70 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/21/2004 | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice CW6 mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICKI HOSSACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 03 C 3067 |
| ) | Paul E. Plunkett, Senior Judge |
| FLOOR COVERING ASSOCIATES ) | |
| OF JOLIET, ) | |
| ) | |
| Defendant. ) | |

OCT 2 2 2004

## MEMORANDUM OPINION AND ORDER

Vicki Hossack sued her former employer, Floor Covering Associates of Joliet ("FCA"), claiming FCA terminated her employment as its office manager based on her gender. At the close of the evidence, FCA filed a Rule 50(a) motion for judgment. That motion was taken under advisement pending the jury verdict. The jury found for Hossack and awarded her $250,000 in compensatory damages. After the entry of judgment on the jury's verdict, Defendant renewed its motion for judgment notwithstanding the verdict under Rule 50(b).

We have carefully reviewed the evidence adduced at trial and conclude that there was insufficient evidence from which a jury could reasonably find that Hossack was terminated on the basis of gender. Accordingly, Defendant's Rule 50(b) motion is granted; the judgment previously entered on the jury's verdict is vacated and judgment is entered for Defendant.[1]

---

[1]Defendant's Rule 50(a) motion, both parties' motions for remittitur and Plaintiff's motion for back pay are all denied as moot. Defendant's motion for sanctions, filed before the trial began, is also denied. Of course, should the appellate court disagree with our decision, the jury's verdict



## Legal Standard

In considering a motion for judgment as a matter of law, the court must review all the evidence in the record, drawing all inferences in favor of the nonmoving party and disregarding all evidence favoring the moving party that the jury was not required to believe. *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000). Thus, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151. In order to overturn a verdict for Plaintiff, "there must have been no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999) (internal quotations omitted). In the following recitation of the facts adduced at trial, we attempt to follow those admonitions:

## Facts

Vicki Hossack ("Hossack" or "Plaintiff") worked as a bookkeeper and office manager for Floor Covering Associates of Joliet ("FCA" or "Defendant") from 1997 until June of 2002. Her immediate superiors were Dave Lenz, the general manager, and Robert Hill, the owner. Everyone agreed Hossack was an excellent employee. She worked well with others, and her job performance was never criticized. She received at least one raise during her tenure at FCA. Some time in early 1991, Hossack began a clandestine affair with Nick Cladis, a top salesman who also shared general

---

far exceeds the allowable cap of $50,000 in compensatory damages, and whatever figure is eventually awarded for damages below $50,000 must include back pay of nearly $6,000.

manager duties with Lenz. Their relationship lasted one and a half years, ending when Hossack's husband uncovered love letters from Cladis to Hossack. The day after this discovery, June 12, 2002, Hossack, now facing a crisis in her marriage, requested a personal day off from FCA. The next day, she called Lenz and asked to take her remaining eight vacation days in order "to resolve a personal matter." Lenz approved the vacation time.

Hossack returned to FCA the next Monday, June 17, to fill out the requisite vacation request forms and to meet with Lenz. She told him about the affair, that her husband was quite distraught, and that their daughter feared he may kill himself. Hossack said her husband did not want her working with Cladis and she needed vacation time to work things out with her husband. Although Lenz testified that he believed Hossack had tendered her resignation at that meeting, the facts support a reasonable inference that she had indicated that these problems may force her to resign. Lenz then called Robert Hill, FCA's owner, to let him know of his meeting with Hossack. Hill asked Lenz to set up a meeting with Hossack the following day.

On June 18, Hossack met with Hill and Mary Gallup, FCA's human resources director. There she repeated her concern that her husband did not want her working with Cladis. Hill, desiring to keep her in FCA's employ, suggested there were three possible options. Hill could transfer Cladis to a different store in Naperville, Hossack could resign, or Hossack and Cladis could continue to work together at the Joliet store. Hill made it clear that they valued her as an employee and wanted to keep her at FCA. Hill told Hossack that they should consider these options over the next few days.

Meanwhile, Hossack's husband phoned Cladis, telling him he would make Cladis's life as miserable as Cladis had made his. Cladis reported this "threat" to Lenz.

By June 20, while Hossack was still on vacation, her efforts to reconcile with her husband were apparently successful enough that he no longer objected to her working with her former lover. She called Lenz to let him know that even if Cladis could not be transferred, her husband would allow her to return. Lenz surprised her by saying FCA was accepting her "resignation," noting that her continued presence at the store would be too disruptive. When she went in the next day to pick up her check, Lenz told her he was sorry she would no longer work for FCA, but Cladis was a better choice for the company. Lenz asked Hossack to sign a voluntary resignation form, but she refused. FCA sent a letter authored and signed by Gallup reiterating FCA's claim that Hossack had resigned and claiming that her presence at the store would be "disruptive."

Cladis was not discharged. He was transferred to Naperville shortly after Hossack filed a charge with the Illinois Department of Human Rights, complaining that only she had suffered adverse consequences because of her affair with Cladis. A few months later, he and Lenz left FCA together to work for a rival company. The two men had been friends and coworkers for eight years.

## Discussion

We need answer only one question — was the jury's verdict based on sufficient evidence to rationally infer that Hossack was a victim of intentional discrimination. Put another way, did the plaintiff present sufficient evidence to show she would have retained her job if she had been a man and everything else had been the same. *Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 965 (7th Cir. 1999).

Initially, we note that Plaintiff tried this case using the *McDonnell Douglas* paradigm. That formula allows a plaintiff to present indirect evidence to establish a prima facie case. The employer

-4-

must respond by articulating a legitimate, non-discriminatory reason for the action taken. The burden then shifts back to the employee to show that the employer's proffered reasons are but pretext for discrimination. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). A prima facie case is established when the plaintiff can show she was a member of a protected class, performing her job satisfactorily, who experienced an adverse employment action while similarly situated employees were treated more favorably. *Id.*

Hossack contended she was performing her job satisfactorily yet was terminated, and a man similarly situated (Cladis) suffered no adverse employment action. Plaintiff is correct on only three of her four assertions. Her problem arises from the fact that Cladis was not similarly situated. Plaintiff seems to believe that the "similarly situated" component of the *McDonnell Douglas* test is satisfied by a showing that Hossack and Cladis, both married persons, engaged in an extramarital affair. She is mistaken. "Similarly situated" means not only similar conduct but similar employment positions with respect to performance and qualifications. *Radue v. Kimberly-Clark*, 219 F.3d 612, 617 (7th Cir. 2000). Cladis was a top salesman who shared general manager duties with Lenz. Hossack was an office manager. Their positions in the company were quite different. Further and equally important, Hossack, not Cladis, was the one claiming she would have to leave, and Hossack's husband threatened Cladis — facts made known to FCA decisionmakers. Thus, Plaintiff failed to establish the fourth prong of the *McDonnell Douglas* test. Even if she had made a prima facie showing, her case must still fail. The evidence produced by both the Defendant and the Plaintiff strongly suggested that Hossack's termination was driven by FCA's concern over her husband's possible reaction to the affair. Plaintiff made no effort to dispute this rationale.

Even if Lenz did tell Hossack that Cladis was a "better choice," that hardly casts doubt on FCA's proffered reason for Hossack's discharge. Cladis could be a better choice for any number of reasons, and nothing suggests that Hossack's gender, or Cladis's gender for that matter, was one of them. For these reasons, the so-called indirect method approving gender discrimination fails.

Further, there is no direct proof of gender discrimination. That is, there is no statement, admission or smoking gun by which a decisionmaker could conclude that gender entered into the action taken against Plaintiff. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir.2003). As Judge Posner has explained, however, this is not fatal to Hossack's claim. She may still prevail by presenting circumstantial evidence such as "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir.2003).

Thus, our review of the evidence looks to see whether all the circumstantial evidence viewed in a light most favorable to Hossack would provide a rational basis for the jury's verdict by pointing directly to a discriminatory reason for her termination. Viewed in a light most favorable to Plaintiff, we find the following pieces of evidence from which we might construct a mosaic of discrimination.

### I.

FCA contended that it had not terminated Hossack but only accepted her resignation. The jury could have easily concluded that Hossack never resigned; she asked for and received vacation

time, which continued even past the date of her dismissal. She continued to speak with FCA personnel to discuss options that would enable her to remain with the company. When she told FCA her husband no longer objected to her return, the company inexplicably did not even consider letting her return. But having concluded this resignation scenario was false, the jury could not rationally conclude that gender discrimination was at work. There was no evidence from which to conclude that Hossack's gender, rather than concern over her husband's reaction to the affair, caused FCA to terminate her.

## II.

Cladis was transferred immediately after Hossack filed the EEOC complaint. Clearly, FCA's action is suspicious since the EEOC complaint alleged a failure to take action against the other adulterer, but FCA explained that the transfer was caused by the reaction of employees at the Joliet facility who were angry with Cladis for having "caused" Hossack to leave. Again, Hossack presented nothing to cast doubt on the validity of this explanation.

## III.

Lenz's comments that Hossack's continued employment would be disruptive and that Nick is a better choice for the company may support an inference that she was fired as a result of the affair and the troubles arising from it, but that is not gender discrimination. Title VII protects employees from discrimination based on sex, not discrimination based on sexual activity. *See Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1254 (D. Kan. 2001) ("Employees who are having affairs do not constitute a protected group for the purposes of Title VII discrimination claims."); *Kahn v. Objective*

*Solutions, Int'l*, 86 F. Supp 2d 377, 380 (S.D.N.Y. 2000) (dismissing sex discrimination claim where supervisor, following his wife's orders, fired the employee with whom he had been having an affair); *Campbell v. Masten*, 955 F. Supp. 526, 528-29 (D. Md. 1997) (finding no gender discrimination where employee was discharged by former lover's friend after affair had ended); *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990). *But see Oldfather v. Ohio Dept. of Transp.*, 653 F. Supp. 1167, (S.D. Ohio 1986) (finding Title VII violation where evidence overwhelmingly showed that female employee was fired after having affair and similarly situated employee was not because employers were concerned about her "immoral" behavior).

Plaintiff has certainly not even begun to prove that some sort of Hawthornian-era scheme of moral policing was at work here — she produced no evidence to suggest that FCA decided to terminate her based on any outdated notions that women carrying on adulterous affairs should be punished while the men they are carrying on with may be excused. Lenz's comments that Plaintiff's presence would be "disruptive" and that "Nick is a better choice for the company" evidence concern for FCA's business operations. They cannot rationally be held to present distaste for a woman who had an affair. Evidence Plaintiff brought out suggesting Lenz and Cladis were friends — a relationship Lenz attempted to downplay — and that Lenz may have been protecting his chum by firing Hossack, likewise supports a conclusion that factors other than gender motivated Defendant's decision. The jury was presented with no evidence that FCA routinely punished women having affairs without punishing the men. Nor were they shown any evidence that FCA routinely treated women differently than men. It is difficult to see exactly where Plaintiff would like us to look to find any evidence of gender discrimination. She presented no evidence at trial and now makes no

arguments specifically pointing to gender to guide us, and our powers of inference can reach only so far.

We do not lightly set aside a jury verdict, but we simply find no mosaic that leads directly to an inference of gender discrimination. Indeed, we find only a few scattered pieces of colored glass which, no matter how arranged, show only a non-discriminatory, though perhaps ill advised, image of the termination of an excellent employee.

## Conclusion

For the foregoing reasons, Defendant's motion for judgment as a matter of law is granted. The jury verdict in favor of Plaintiff is vacated. This is a final and appealable order.

**ENTER:**

_____
SENIOR U.S. DISTRICT JUDGE

**DATED:** OCT 2 1 2004